IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ACE AMERICAN INSURANCE CO.,     )
and FEDERAL INSURANCE CO.,     )
          )
         Plaintiffs,     )
          )
vs.          )     Case No. 12-cv-0242-MJR-DGW
          )
SANDBERG, PHOENIX &     )
   VON GONTARD, PC.,     )
G. KEITH PHOENIX,     )
and W. WYLIE BLAIR,     )
          )
        Defendants.     )

MEMORANDUM AND ORDER

REAGAN, District Judge:

### A.    **Procedural Overview**

Six months ago, two insurance companies filed a legal malpractice suit in this Court against a law firm (Sandberg, Phoenix and Von Gontard, P.C.) and two lawyers from the firm (Keith Phoenix and Wylie Blair).  The complaint alleged that ACE American Insurance Company and Federal Insurance Company issued liability insurance policies to Safariland, LLC, that Safariland was the named defendant in a state court products liability/negligence action (*Brough v. Safariland, et al.*, St. Clair County Circuit Court Case No. 07-L-0358), that the firm and lawyers botched the defense of the state court suit, and that this resulted in ACE and Federal being forced to pay inflated sums to settle the suit just prior to trial.  ACE and Federal now seek to recover from the firm and the lawyers the full amount of the settlement the insurers paid on Safariland's behalf, plus legal expenses relating to the state court case and other damages.   This recovery is sought via various theories of subrogation, as well as a direct claim for legal malpractice.

Plaintiffs filed an amended complaint here on June 7, 2012, after which the undersigned District Judge verified that subject matter jurisdiction lies under the diversity statute, 28 U.S.C. 1332.

Defendants (the firm and the lawyers) responded to the amended complaint with a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  That motion was fully briefed on August 9, 2012.  For the reasons stated below, the Court denies the dismissal motion.  Analysis begins with a summary of the key undisputed facts and the applicable legal standards.

> B.     <u>Summary of Key Facts and Allegations</u>

Armor Holdings, Inc. was the predecessor in interest to Safariland, LLC.  Federal Insurance Company issued a primary Commercial General Liability insurance policy to Armor (the "Federal primary policy"), effective April 1, 2006 to April 1, 2007.  Federal also issued a Commercial Excess and Umbrella Liability insurance policy to Armor (the "Federal excess/umbrella policy"), effective April 1, 2006 to April 1, 2007.  ACE Insurance Company issued an Excess Liability Catastrophe policy to Armor (the "ACE excess policy"), effective April 1, 2006 to April 1, 2007.  Safariland is the successor in interest to Armor.  The amended complaint alleges that Safariland qualifies as an insured under all three policies.

The Federal primary policy provided limits of $1 million per occurrence, after a $1 million self-insured retention.  The Federal excess/umbrella policy provided limits of $5 million per occurrence.  The ACE excess policy provided limits of $20 million per occurrence.  The policy coverages have been summarized as follows (*see* Doc. 23, pp. 2-3):

| | |
|---|---|
| $1 - $ 1,000,000 | Safariland SIR |
| $1,000,001 - $ 2,000,000 | Federal CGL ["primary"] Policy |
| $2,000,001 - $ 7,000,000 | Federal Excess and Umbrella Policy |
| $7,000,001 - $27,000,000 | ACE Excess Liability Catastrophe Policy. |

In this Court, Federal and ACE allege that Sandberg, Phoenix and Von Gontard, Keith Phoenix, and Wylie Blair (collectively, "Phoenix") negligently defended Safariland and its predecessor and related entities (collectively, "Safariland") in *Brough v. Safariland, et al.* ("the Brough case").  The Brough case arose from the disabling injuries sustained by a Belleville, Illinois police sergeant (Jon Brough) who was shot in the face on November 10, 2006, during a tactical team

dynamic entry into a local residence to apprehend a fugitive.  Safariland allegedly manufactured and sold the ballistic shield and flash-bang stun grenades used by Sergeant Brough and his fellow officers in the entry.  Brough and his wife sued in state court, seeking to hold Safariland liable.

The state court litigation was long and extensive.  Filed in July 2007, the Brough case was scheduled to start trial on August 22, 2011 but culminated in a settlement right after the trial court judge (1) determined that defense counsel deliberately had failed to disclose responsive documents in discovery and (2) issued a sanctions order finding flagrant violations by defendants and striking their pleadings.  The sanctions order established liability and left Safariland with the choice of proceeding to trial on damages or settling the case.

The August 2011 sanctions order, as amended on October 28, 2011, stated (Doc. 19-1, emphasis in original):

> Based solely on the evidence presented in open court, the Court finds that the discovery violations committed by defense counsel requires [sic] the Court to impose a sanction under Supreme Court Rule 219.
>
> The Court finds it disappointing that in the face of all the evidence defense counsel still argues that their flagrant violations fall short of sanctionable conduct.  Additionally, the Court finds defense counsel's answers to these discovery violations totally unsatisfactory.
>
> It is the responsibility of the Court to confront these violations without hesitation and to impose a sanction proportionate to the violations and NOT TO PUNISH.  The discovery violations committed by defense counsel were not mere delays or insignificant mistakes that occurred inadvertently but rather deliberate or systematic conduct.  Their violations undermine the entire system.  Their actions showed a pronounced disregard of the Court's authority because they believe that they and they alone decide discovery matters.  These violations cannot be cured and they have deprived Wendy and Jon Brough of a fair trial.
>
> The striking of pleadings is to be granted only in the most egregious and systematic, deliberate or intentional discovery violations.  This Court has never granted such a motion in its seventeen year tenure … but justice requires the Court to strike the defendant's pleadings.  Defense counsel's misconduct is binding on their client.  As difficult as a decision as this has been, the Court believes the ruling is just.

In the case at bar, Federal and ACE ("Plaintiffs") allege that the above-quoted order exponentially increased the potential verdict of any damages-only trial, drove up the value of the Brough case, and resulted in a negotiated settlement of a substantial amount (the public disclosure of which is prohibited under a confidentiality provision of the settlement agreement). Plaintiffs look to recover what they spent in the Brough case on the grounds that Phoenix owed Safariland duties of reasonable care and professional competence, that Phoenix breached those duties, that the malpractice resulted in payments of large sums of money by Federal and ACE to settle the Brough case, that Plaintiffs are the subrogees of Safariland's claims against Phoenix, and that Plaintiffs are subrogated to Safariland's rights of recovery from Phoenix. Federal also presents a direct claim of legal malpractice on the theory that, as the defending primary insurer of Safariland, Federal was a "client" of Phoenix for the Brough case, and Phoenix violated its professional obligations and duty of care owed to both Safariland and Federal.

Phoenix moves to dismiss the amended complaint on four grounds:

(1) Plaintiffs have failed to establish a contractual right to assert Safariland's claims against Phoenix;

(2) ACE, as an excess insurer, lacks standing to pursue an equitable subrogation claim against Phoenix;

(3) Federal, as an umbrella insurer, lacks standing to pursue an equitable subrogation claim against Phoenix;[1] and

(4) Federal (as "a purported primary insurer") has not asserted facts supporting a direct legal malpractice claim under Missouri (or Illinois) law (Doc. 23, pp. 1-2).

---

[1]     Though Phoenix uses the term "standing," the briefs indicate the word is not used to suggest that this Court cannot reach the merits of the controversy before it. *See, e.g., Freedom from Religion Foundation, Inc. v. Obama,* **641 F.3d 803, 805 (7th Cir. 2011)("unless the case presents a justiciable controversy, the judiciary must not address the merits").** Rather, Phoenix maintains that applicable state law does not recognize a cause of action (equitable subrogation) to be brought by Plaintiffs like Federal and Ace (excess and umbrella insurers).

**C.**   **Applicable Legal Standards**

Federal Rule of Civil Procedure 12(b)6) governs motions to dismiss for failure to state a claim.  In deciding a 12(b)(6) motion, the district court's task is to determine whether the complaint includes "enough facts to state a claim to relief that is plausible on its face." ***Khorrami v. Rolince*, 539 F.3d 782, 788 (7th Cir. 2008),** *quoting Bell Atlantic Corp. v. Twombly,* **550 U.S. 544 (2007).** A complaint need not contain detailed factual allegations to meet this standard; but it must "go beyond mere labels and conclusions" and contain "enough to raise a right to relief above the speculative level." ***G&S Holdings, LLC v. Continental Cas. Co.,* -- F.3d --, 2012 WL 4120549 (7th Cir. Sept. 20, 2012),** *citing Twombly,* **550 U.S. at 555.  *See also Ashcroft v. Iqbal,* 556 U.S. 662, 663-64 (2009).**

"Even after *Twombly*, courts must still approach motions under Rule 12(b)(6) by 'construing the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor.'" ***Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009),** *cert. denied,* **130 S. Ct. 1141 (2010),** *quoting Tamayo v. Blagoyevich*, **526 F.3d 1074, 1081 (7th Cir. 2008).**

The Seventh Circuit further has pointed out:

> ***Iqbal*** clarified two working principles underlying the ***Twombly*** decision. First, although the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion. *Id.* Accordingly, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second, the plausibility standard calls for a "context-specific" inquiry that requires the court "to draw on its judicial experience and common sense." *Id* . at 679.

*McReynolds v. Merrill Lynch & Co., Inc.,* **-- F.3d --, 2012 WL 3932328, \*9 (7th Cir. Sept. 11, 2012).**

So, in the instant case, this Court reviews the amended complaint, taking as true all well-pled factual allegations.  After excising the allegations *not* accepted as true (legal conclusions), the Court must decide whether the remaining factual allegations plausibly suggest that ACE and Federal are entitled to relief.  *McCauley v. City of Chicago,* **671 F.3d 611, 616 (7**[th]** Cir. 2011).**

Finally, a Rule 12(b)(6) dismissal motion "must be decided solely on the face of the complaint and any attachments that accompanied its filing." *Miller v. Herman,* **600 F.3d 726, 733 (7**[th]** Cir. 2010),** *citing* **FED. R. CIV. P. 10(c)** and *Segal v. Geisha NYC LLC,* **517 F.3d 501, 504-05 (7**[th]** Cir. 2008).**  If, on a Rule 12(b)(6) motion, matters *outside* the pleadings are presented to (and not excluded by) the court, the motion must be treated as a Rule 56 motion for summary judgment. *General Insurance Co. of America v. Clark Mall Corp.,* **644 F.3d 375, 378 (7**[th]** Cir. 2011); FED. R. CIV. P. 12(d).**  That means the court must notify the parties that it will consider the additional matters and provide a reasonable opportunity for the parties to present all materials pertinent to the motion, so construed. *Doss v. Clearwater Title Co.,* **551 F.3d 634, 639-40 (7**[th]** Cir. 2008).** *See also Santana v. Cook County Bd. of Review,* **679 F.3d 614 (7**[th]** Cir. 2012).**  Of course, documents attached to the complaint and central to the claims are considered as part of the complaint itself. *See Arnett v. Webster,* **658 F.3d 742, 746 (7**[th]** Cir. 2011)**. *Accord Citadel Group, Ltd. v. Washington Regional Medical Center,* **-- F.3d --, 2012 WL3517577, \* 10 (7**[th]** Cir. Aug. 15, 2012).**  The undersigned now turns to the pending motion.[2]

D.     **<u>Analysis</u>**

Phoenix moves to dismiss all claims with prejudice under Federal Rule of Civil Procedure 12(b)(6).

The amended complaint contains the following claims:

---

[2]       Bearing note is the fact that the lone attachment to the amended complaint (and original complaint) was the trial judge's sanctions order from the Brough case.  None of the insurance policies was attached to the complaint; but key portions of the policies are quoted in the body of the amended complaint (*see* Doc. 19, ¶41 - ¶43).

**Count I – Legal Malpractice (Conventional Subrogation, Ace vs. all Defendants)**
**Count II – Legal Malpractice (Conventional Subrogation, Federal vs. all Defendants)**
**Count III – Legal Malpractice (Equitable Subrogation, Ace vs. all Defendants)**
**Count IV – Legal Malpractice (Equitable Subrogation, Federal vs. all Defendants)**
**Count V – Legal Malpractice (Direct Claim, Federal vs. all Defendants).**

→      **Conventional Subrogation Claims**

Urging dismissal of Counts I and II, the conventional subrogation claims, Phoenix argues: "Plaintiffs have not placed the relevant insurance policies before the Court, rendering it impossible for the Court to determine whether Plaintiffs can rightfully state claims they conclusorily claim to possess" (Doc. 23, p. 6).   In other words, Phoenix maintains that by failing to attach the three insurance policies to the complaint (and merely quoting portions of the policies in the amended complaint), Plaintiffs have forced the Court and Phoenix to "accept on faith" that the language they quote in the complaint is accurate, is not "taken out of context," and is not subject to an undisclosed coverage exclusion.  And until Plaintiffs "can produce facts establishing their purported contractual rights to assert Safariland's claims against [Phoenix], Plaintiffs have not stated valid conventional subrogation claims" (Doc. 23, p. 6).

In broad terms, subrogation is the substitution of a person or entity in place of a creditor to whose rights he succeeds in relation to a debt.  A subrogated insurer stands in the shoes of the insured, inheriting the rights of the insured and subject to any defenses a third party would have against the insured.  **16 Couch on Insurance § 222:5 (3rd edition).**  A distinction often is made between conventional (or "contractual") subrogation and legal (also referred to as "common law" or "equitable") subrogation.  Legal subrogation arises by operation of law, while conventional subrogation arises by convention or the contract of the parties.  "Otherwise stated, the insurer's right to subrogation may rest either upon the operation of law, arising upon the fact of payment made by the insurer, or upon the contract between the insurer and the insured expressly providing for subrogation."  **16 Couch on Insurance § 222:20 (3rd edition).**

Similarly, the Seventh Circuit has explained:

The right of subrogation originated in equity. *Dix Mut. Ins. Co. v. LaFramboise*, … 597 N.E.2d 622, 624 ([Ill.] 1992). It allowed a person who was compelled to pay someone else's claim or debt to succeed to that person's rights, so that the payor could recover from the individual whose conduct gave rise to the claim or debt. *See id.* In this way, courts sought to achieve substantial justice, "by placing ultimate responsibility for the loss upon the one against whom in good conscience it ought to fall." *Id.*; *see also Schultz v. Gotlund*, … 561 N.E.2d 652, 653 ([Ill.] 1990)….

Subrogation can arise from an agreement (express or implied) between the subrogor and subrogee, in which case it is often referred to as conventional or contractual subrogation…. But the right to subrogation does not invariably depend on the existence of an agreement; equitable subrogation can arise simply from the fact of payment.

*Mutual Service Cas. Ins. Co. v. Elizabeth State Bank* 265 F.3d 601, 626 (7th Cir. 2001). *See also American Nat. Bank and Trust Co. of Chicago v. Weyerhaeuser Co.*, 692 F.2d 455, 460, n.12 (7th Cir. 1982)("Subrogation which is grounded in equity and applied as a matter of law is typically denominated 'legal' subrogation.   On the other hand, subrogation that is founded upon an express or implied agreement (*e.g.,* on an insurance contract where the insurer is subrogated to any recovery for injuries received directly from a tortfeasor) is termed 'conventional' subrogation.").

In the case sub judice, Phoenix challenges Counts I and II (the conventional subrogation claims) on the ground that Plaintiffs quoted *portions* of the insurance policies/contracts in the amended complaint, rather than attaching all of the entire policies to the complaint, which leaves the Court unable to determine whether perhaps another provision of the policy contradicts the quoted portion or excludes coverage.   The Court is not persuaded that dismissal is warranted on this basis. As noted above, a 12(b)(6) motion tests the sufficiency of the complaint as opposed to the merits of the case.   The question is not whether Plaintiffs have established a right to conventional

subrogation, it is whether (presuming as true all well-pled factual allegations) the amended complaint states a facially plausible claim to relief.

The amended complaint does so.  It quotes the pertinent provisions of the insurance policies and contains sufficient facts (regarding the contractual obligations arising under the policies and the payment of the settlement in the Brough case, etc.) to support a facially plausible entitlement to relief.  Phoenix cites, and this Court is aware of, no Seventh Circuit case or Rule of Civil Procedure *requiring* a plaintiff to attach insurance policies or contracts to a complaint, especially in a legal malpractice suit (as opposed to a declaratory judgment suit seeking determination of a duty to defend or indemnify under an insurance policy).

Phoenix may have a valid defense based on one or more of the insurance policies, but Plaintiffs do not shoulder the burden of pleading around anticipated defenses.  The Seventh Circuit just reiterated this principle seven weeks ago:  "Judges should respect the norm that complaints need not anticipate or meet potential affirmative defenses." **Richards v. Mitcheff**, -- **F.3d --, 2012 WL 3217627, \*2 (7th Cir. Aug. 9, 2012).**  We are at the pleading stage of this lawsuit, and the complaint pleads facially plausible claims for contractual subrogation.  Counts I and II (the conventional or contractual subrogation claims) survive 12(b)(6) scrutiny.

→   **Equitable Subrogation Claims**

Next, Phoenix contends that ACE (as an excess insurer) and Federal (as an umbrella insurer) lack standing to pursue *equitable* subrogation claims against Phoenix.  Unlike conventional subrogation claims (which rest on a contract or agreement between subrogor and subrogee), equitable subrogation claims do not depend on the existence of an agreement and "can arise simply from the fact of payment." **Mutual Service Cas. Ins. Co., 265 F.3d at 626 (7th Cir. 2011).**  This sounds straightforward enough, but application of the doctrine of equitable subrogation can prove tricky.

As Judge Posner emphasized one year ago in *Wilder Corp. of Delaware v. Thompson Drainage and Levee Dist.*, 658 F.3d 802, 807 (7th Cir. 2011):

> Equitable subrogation is a troublesomely vague doctrine: "There is no general rule which can be laid down to determine whether a right of [equitable] subrogation exists since this right depends upon the equities of each particular case." *Dix Mutual Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill. Dec. 648, 597 N.E.2d 622, 624 (1992).

In its memorandum supporting dismissal, Phoenix cites *LaFramboise* (an opinion of the Illinois Supreme Court) for the general proposition that one who asserts a right of equitable subrogation steps into the shoes of the one whose debt he paid and can only enforce those rights which the latter could enforce. *See* **Doc. 23, p. 7, *citing Dix Mutual Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 625 (Ill. 1992).** Phoenix maintains, however, that Missouri (not Illinois) law governs Plaintiffs' equitable subrogation claims.

A split in authority exists as to whether an excess insurer can bring a legal malpractice claim based on equitable subrogation against an attorney retained by a primary insurer; and the parties disagree as to which state's law governs here. So, a preliminary question the Court must address is which state's substantive law applies to Plaintiffs' claims. Because subject matter jurisdiction lies under the diversity statute, the forum state's choice-of-law rules determine the applicable substantive law. *Storie v. Randy's Auto Sales, LLC.,* **589 F.3d 873, 879 (7th Cir. 2009), *citing Sound of Music Co. v. Minnesota Min. & Mfg. Co.,* 477 F.3d 910, 915 (7th Cir. 2007). *Accord Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).**[3]

---

[3]  "A choice-of-law determination is only required if a difference in law will affect the outcome of a case." *Murphy v. Mancari's Chrysler Plymouth, In.,* **948 N.E.2d 233, 236 (Ill. App. 2011), *citing Townsend v. Sears, Roebuck and Co.,* 879 N.E.2d 893 (Ill. 2007).** Neither the Illinois Supreme Court nor the Missouri Supreme Court has squarely decided whether an excess insurer can bring a legal malpractice claim based on equitable subrogation against a lawyer retained by a primary insurer, and conflicts exist between the lower state and federal courts that have confronted the issue in those two states. Additionally, the parties agree that a material conflict exists between Illinois and Missouri law on this issue.

Here, Illinois is the forum state. Illinois applies the "most significant contacts" test to choice-of-law disputes. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.,* **580 F.3d 543, 547 (7ᵗʰ Cir. 2009),** *citing Westchester Fire Ins. Co. v. G. Heileman Brewing Company, Inc.,* **747 N.E.2d 955, 961 (Ill. App. 2001).**   This test, for tort claims, is found in Section 145 of the *Restatement (Second) of Conflict of Laws* and "involves balancing a number of factors, including the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile or place of business of each party; and the place where the relationship between the parties is centered." *Ennenga v. Starns*, **677 F.3d 766, 774 (7ᵗʰ Cir. 2012),** *citing Wreglesworth ex rel. Wreglesworth v. Arctco, Inc.,* **738 N.E.2d 964, 971 (Ill. App. 2000).**

As summarized by the Illinois Court of Appeals in *Mendez v. Atlantic Painting Co., Inc.,* **936 N.E.2d 1135, 1140 (Ill. App. 2010):**

> Section 145 provides that a court deciding a choice-of-law issue should apply the law of the state with "the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971).
>
> In determining which state has the most significant relationship to the case, the court should consider:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered….
> [T]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145(2) (1971).[4]

---

[4]       Phoenix relies on Section 188 of the *Restatement (Second) Conflict of Laws,* which sets forth a most significant relationship test for certain contract cases:
> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
> (2) In the absence of an effective choice of law by the parties …, the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place of contracting,
> (b) the place of negotiation of the contract,

Although Plaintiffs and Phoenix cite different choice of law provisions from the *Restatement*, both involve a most significant relationship test which produces a presumptive choice of law, after which the Court must consider -- under § 6 of the *Restatement (Second) of Conflict of Laws* -- factors such as the relevant policies of the forum, the relevant policies of other interested states, the protection of justified expectations, and the predictability and uniformity of the result. *See* Doc. 23, pp. 11-12, and Doc. 30, pp. 7-8.

Phoenix asserts that although "the underlying litigation occurred in Illinois, there is a pastiche of jurisdictions who can be seen as being involved in this matter" (Doc. 23, p. 8). That may be so, but having considered the above-delineated Restatement factors, the Court determines that Illinois has the *most significant* relationship to the occurrence and parties. The gist of this action is that Phoenix bungled the defense of the Brough case so badly that Safariland (and its insurers) were forced to pay an inflated amount to settle the lawsuit.

Yes, the defense firm has its principal place of business in Missouri, but the firm also has four Illinois offices, the two named attorneys (Phoenix and Blair) are licensed in Illinois, and the allegedly deficient defense was rendered in a case pending in Illinois state court. The *injury* is the forced payment of the huge settlement to the Broughs, payments mandated by a judge's order issued in Illinois and received by the Broughs in Illinois. Moreover, the *conduct causing the injury* (the alleged malpractice) is best viewed as having occurred in Illinois where the case was litigated, the hearings

---

(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.
This Court would reach the same result here if it applied § 188 of the Restatement rather than § 145 – Illinois has the most significant relationship.

were held, the sanctions order entered, Safariland's pleadings stricken, and the settlement precipitated.

The amended complaint alleges that conduct by Phoenix in Illinois resulted in the adverse rulings against Safariland and the unnecessarily high amount Safariland consequently had to pay to settle the Brough case.

Additionally, although the parties' domiciles and places of business include Pennsylvania (ACE), Indiana and New Jersey (Federal), Missouri (the law firm and attorney Blair), and South Carolina (attorney Phoenix), *the relationship between the parties was centered* in Illinois where Safariland was sued by the Broughs (Illinois residents) and retained Phoenix to represent it, where both defense lawyers are licensed, filed their pleadings, attended hearings, presented their arguments, and were set for trial, and where the sanctions order was issued and the settlement replaced the jury trial as the means of resolving the litigation. **See, e.g., *Washburn v. Soper*, 319 F.3d 338, 343 (8th Cir.), *cert. denied*, 540 U.S. 975 (2003)(In legal malpractice action against attorney who was licensed in both Illinois and Iowa and maintained his office in Iowa, Court of Appeals held that Illinois had most significant relationship to the parties and the occurrence where "defendant attorney was retained to represent the plaintiffs in Illinois state court proceedings" that involved Illinois residents); *David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112, 1120 (3rd Cir. 1994)(In action in which the relational strands between the parties spanned several states and involved malpractice allegedly committed by attorneys whose legal services *originated* in other states -- i.e., the firm had offices in New York and Washington, D.C. -- the Court of Appeals held that *as a practical matter* the services were rendered in Delaware, that Delaware was the "center of the web of relationships between the parties," and that Delaware had "a particular stake in protecting its legal consumers from negligent attorneys" practicing in that state.).**

Examination of the § 6 factors reinforces the conclusion that Illinois has the most significant relationship with the occurrence and the parties. Without question, the State of Illinois has a strong interest in assuring that lawyers licensed in its state and practicing in its courts of law satisfy their professional duties and are held accountable if they fail to do so. A lawyer who represents a party in an Illinois state court should expect to be subject to Illinois law if he is found to have committed malpractice in the course of that litigation. This is a predictable result. In sum, the Court concludes that Illinois has the most significant relationship to the occurrence and the parties, and Illinois law applies to the equitable subrogation claims against Phoenix.

The next question is whether Illinois law recognizes the right of an excess insurer to bring a legal malpractice equitable subrogation claim against the defense attorney retained by the primary insurer. The Illinois Supreme Court has not decided this issue, so this District Court must predict how the Illinois Supreme Court would rule.

Phoenix argues that Illinois would *not* allow an equitable subrogation claim by Ace and Federal. Phoenix acknowledges that federal district courts applying Illinois law have allowed this kind of claim, citing "Illinois' lead case on the issue, ***National Union Ins. Co. v. Dowd & Dowd, 2 F. Supp. 2d 1013 (N.D. Ill. 1998)***" (Doc. 23, p. 13). In ***National Union,*** an excess insurer (National Union) filed a malpractice action against a law firm (Dowd & Dowd) hired by a self-insured company (Schneider) to represent the company and its driver in a personal injury lawsuit. The personal injury suit resulted in an $8 million verdict that was upheld on appeal. Schneider paid the first $3 million, and National Union paid the remaining $5 million. Schneider (the self-insured) had hired the allegedly negligent law firm, but National Union (the excess carrier) sued the firm.

In ***National Union ,*** the federal district court, applying Illinois substantive law on a motion to dismiss, had to determine whether the Illinois Supreme Court would recognize an excess insurer's right to maintain a legal malpractice suit against a self-insured's defense attorney. After a thorough

analysis, the court predicted that the Illinois Supreme Court would find that "equitable subrogation should be applied to prevent injustice and to shift the economic burden upon those responsible for the loss" and held that "an excess insurer should be allowed to assert a legal malpractice claim against its insured's defense attorney under the doctrine of equitable subrogation." *National Union,* 2 F. Supp. 2d at 1021, 1027.

But Phoenix notes that since *National Union* was decided, a contrary trend has emerged in other states, and "courts applying the law of Arizona, Arkansas, Colorado, Florida, Indiana, Kentucky, Missouri and Ohio have all determined that allowing an excess insurer to assert an equitable subrogation claims should not be allowed" (Doc. 23, p. 13). Most of these courts have emphasized that their respective states forbid the *assignment* of legal malpractice actions and have reasoned that assignment and subrogation are sufficiently similar doctrines that legal malpractice claims should *not* be subject to subrogation. Examples of such cases include *Querrey & Harrow, Ltd. v. Transcontinental Ins. Co.,* 861 N.E.2d 719, 723 (Ind. App. 2007)("**We agree with those jurisdictions that hold that subrogation amounts to an assignment as "each operates to transfer from one person to another a cause of action against a third, and the reasons of policy which make certain causes of action nonassignable would seem to operate as forcefully against transfer of such causes of action by subrogation.")**[5]; *Essex Ins. Co. v. Tyler,* 309 F. Supp. 2d 1270, 1274 (D. Colo. 2004)(predicting that Colorado Supreme Court would "**follow the policy concerns related to the limitation of non-client third-party claims of legal malpractice and the prohibition of the assignment of such claims … and would proscribe professional malpractice-based claims by excess insurers based on a theory of**

---

[5]    The Indiana Supreme Court affirmed, adopting the appellate court's opinion that a client's excess insurer was not entitled to bring a legal malpractice suit via equitable subrogation against the attorneys who defended the client in an underlying products liability action. *See Querrey & Harrow, Ltd. v. Transcontinental Ins. Co.,* **885 N.E.2d 1235 (Ind. 2008).**

equitable subrogation."); and *Capitol Indemn. Corp. v. Fleming*, 58 P. 3d 965 (Ariz. App. 2002)(policies that prohibit assignment of legal malpractice claim also prohibit equitable subrogation of legal malpractice claim).

Like Indiana, Colorado, and Arizona, Illinois generally forbids the assignment of legal malpractice actions.  The Illinois Court of Appeals (Fourth District) reiterated this in *Grimes v. Saikley*, 904 N.E.2d 183, 194 (Ill. App. 2009):

> Illinois courts have consistently held a legal-malpractice claim is not assignable because of the personal nature of the attorney-client relationship and the potential for abuse.  [Citations omitted.]  It has been stated that "that 'sound public policy prohibits the assignment of legal-malpractice claims since an assignee would be a stranger to the attorney-client relationship, who was owed no duty by the attorney and who suffered no injury from the attorney's actions.'"

*See also Neal v. Baker*, 551 N.E.2d 704, 705 (Ill. 1990)("It is well recognized that a fiduciary relationship exists between an attorney and a client, and the attorney owes the client the utmost fidelity, honesty and good faith….  An attorney owes a duty to a nonclient only in the most limited circumstances.").

This general rule is subject to exceptions.  For instance, in *Learning Curve International, Inc. v. Seyfarth Shaw, LLP*, 911 N.E.2d 1073 (Ill. App. 2009), the Illinois Court of Appeals (First District) acknowledged the public policy reasons for disallowing assignment of legal malpractice claims, but noted that Illinois *does* permit the transfer of a cause of action for legal malpractice under certain circumstances (like when a client dies subsequent to filing a malpractice claim).  The appeals court reversed the trial court's entry of summary judgment after concluding that a corporation's assignment of its legal malpractice claim to former shareholders (who suffered the loss due to the alleged malpractice) did <u>not</u> violate public policy.   In reaching this result, the appeals court cited with approval the decisions of other courts which had distinguished between the voluntary assignment of a "bare legal claim for malpractice" and the assignment of a malpractice claim that is

part of a general assignment in a commercial setting or commercial transaction. *Learning Curve,* **911 N.E.2d at 1081,** *citing Cerberus Partners, L.P. v. Gadsby & Hannah,* **728 A.2d 1057, 1059-60 (R. I. 1999).**

Having carefully reviewed the extensive case law, the undersigned Judge finds valid arguments and legitimate policy considerations on both sides of this issue. The task before the undersigned Judge is to predict how the Illinois Supreme Court would answer the question. Guided by the federal district court decisions which have resolved the same issue and state court cases in analogous contexts, the undersigned concludes that, on the particular circumstances of this case, this state's high court would allow an excess insurer to bring a legal malpractice suit against the insured's defense attorneys under the theory of equitable subrogation.  Accordingly, this Court will not dismiss Plaintiffs' equitable subrogation claims via the Rule 12(b)(6) motion currently before it.

In *National Union,* the court began its analysis by recognizing the distinct roles and obligations of a primary insurer and an excess insurer.

> A primary insurer's duty to defend its insured generally includes the right to select the attorney and to control the litigation…. Since the primary insurer contracts with the attorney, pays the attorney's legal fees, and directs the litigation or settlement of the claim, it stands to reason that the primary insurer is one of the attorney's clients…. Excess insurers, on the other hand, do not have the duty to defend the insured…. Since the excess insurer generally has no legal or contractual duty to defend, "[t]he excess carrier typically has no right to select counsel or direct counsel's actions, and … has no direct relationship with the attorney retained to defend an action against the insured.

*National Union,* **2 F. Supp. 2d at 1018.**

Pointing out that the Illinois Supreme Court had not yet addressed whether an excess insurer can be equitably subrogated to its insured's legal malpractice claim, the court then traced several Illinois Supreme Court cases that applied equitable subrogation in a slightly different insurance contexts, reaching the conclusion that "equitable subrogation should be applied to prevent injustice and to shift the economic burden upon those responsible for the loss," and "the court cannot

discern any reason to limit this general principle to a primary insurer, providing first-party insurance." *National Union,* **2 F. Supp. 2d at 1021.**

Furthermore, "the underlying rationale for applying the doctrine of equitable subrogation in favor or excess liability insurers … is because when the insured has excess insurance, the excess insurer, rather than the insured, bears the cost of the verdict or settlement in excess of the amount of the primary insurance policy…. Thus, courts have concluded that it is equitable and just to allow an excess insurer to recoup its losses by way of equitable subrogation…." *Id.* **at 1022.**

Similarly, in an unreported but well-reasoned 2001 decision, *TIG Ins. Co. v. Chicago Ins. Co.,* **2001 WL 99832 (N.D. Ill. 2001),** the United States District Court for the Northern District of Illinois flatly rejected the argument advanced by Phoenix here and held that an excess insurer *could* bring an equitable (or "legal") subrogation claim against the insured's defense attorneys for malpractice. The Court set forth its rationale for this result:

> In Counts I and III, TIG asserts subrogation claims against the attorney defendants…. Count I is a conventional subrogation claim and Count III is a legal subrogation claim. Conventional subrogation claims arise from contract; legal subrogation claims arise by operation of law. *Schultz v. Gotlund,* … 561 N.E.2d 652, 653 (1990); *American Nat'l Bank & Trust Co. of Chicago v. Weyerhaeuser Co.,* 692 F.2d 455, 460 n. 12 (7th Cir. 1982). The attorney defendants contend that TIG is barred by Illinois public policy from asserting ISU's legal malpractice claim against them via either subrogation doctrine. We disagree. Though the state courts have held that the assignment of legal malpractice claims violates Illinois public policy, we do not believe they would reach the same conclusion on subrogation….
>
> Unlike assignment, subrogation would not lead to the merchandising of malpractice claims. Though a claim can be assigned to anyone willing to pay for it, subrogation rights can be exercised only by those who have fulfilled a duty, imposed by contract or law, to pay for another's loss. Thus, allowing subrogation of legal malpractice claims would not make them a commodity available to the highest bidder.
>
> Subrogation would also not encourage baseless lawsuits. Excess insurers have no more or less incentive to file malpractice suits that do the uninsured. Faced with a large judgment caused by malpractice, both would want to shift some or all of the liability to the attorneys who mishandled the case….

> Moreover, though malpractice litigation may increase if subrogation is allowed, any such increase would be appropriate as a matter of policy. Clients covered by excess insurance policies have little incentive to sue their attorneys for malpractice.  Why should they engage in expensive and time-consuming litigation when the costs of the malpractice will be borne by their insurance company?   Excess insurers, on the other hand, have every incentive to pursue subrogated malpractice claims….

> We also do not believe that allowing subrogation of legal malpractice claims would damage the attorney-client relationship.

In *TIG*, the Northern District of Illinois relied on Illinois appellate court and Supreme Court cases, as well as *National Union*, in reaching its decision.  Relying on *National Union* in his dissent of the Indiana Supreme Court opinion in *Querrey,* Justice Sullivan looked to broad equitable principles and policy concerns regarding the proper allocation of the cost of attorney malpractice, echoing the idea that malpracticing lawyers should not benefit from a windfall just because the insured contracted for excess insurance coverage:

> to completely absolve a negligent defense counsel from malpractice liability would not rationally advance the attorney-client relationship. Moreover, defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer. The only winner produced by an analysis precluding liability would be the malpracticing attorney. Equity cries out for application under such circumstances.

*Querrey,* 885 N.E.2d at 1238, *citing National Union,* 2 F. Supp. 2d at 1023-24 and *quoting Atlanta International Insurance Co. v. Bell,* 475 N.W.2d 294, 297-98 (Mich. 1991).

The concerns expressed in Illinois cases like *Grimes* (holding that legal malpractice cases cannot be assigned, because the assignee is a stranger to the attorney-client relationship who suffered no injury from the lawyer's conduct) lose persuasive force on the facts, as pled, in the instant case.  Here, the excess insurer is *not* a "stranger" to the attorney-client relationship.  Here, the excess insurer *did* suffer injury directly from the attorney's actions.  Plus this plainly is not a case of an insurer selling its cause of action on the open market.

On the facts before this Court, to hold that an excess carrier can never be equitably subrogated to an insured's legal malpractice claim would be tantamount to declaring that the attorney hired by the primary insurer could never owe a duty to an excess carrier. Such a broad prohibition well might produce unintended, unfair, and undesirable consequences, leaving excess insurers devoid of any remedy in certain circumstances.[6]

Finally, this result will not declare open season on attorneys or be detrimental to the legal profession. Insurers in general, and excess insurers in particular, rarely bring legal malpractice claims against attorneys, because (1) often the amount in controversy is not significant enough to be worth the trouble of another lawsuit; (2) with limited exceptions, insurers do control whether the case settles or not, so they are involved in the process; (3) insurers are in the business of paying claims; and (4) rather than sue the lawyers, the insurers just place the lawyers on the equivalent of a "do not call" list and refuse to retain their services in the future.

Like the Northern District of Illinois, this Court finds that equitable principles and policy concerns support permitting an excess liability insurer to be equitably subrogated to an insured's legal malpractice claims, thereby allowing the excess carrier (who has paid for excess liability) to enforce duties already owed by the attorney to the insured, and assuring that the social costs of any malpractice are borne by those responsible for the loss (the lawyers who committed the malpractice). As Plaintiffs properly emphasize here, an excess insurer must satisfy certain requirements before it can assert such a right of subrogation, and the claim would be strictly limited to nonclients who, pursuant to a legal duty, paid for the client's loss or debt as the direct result of

---

[6]    To take an extreme example as hypothetical, what would prevent a defense attorney from helping a plaintiff's lawyer run up a verdict against the defendant in exchange for an agreement not to execute beyond the primary insurance coverage? In that scenario, the defense attorney may have zealously represented his own client and limited his exposure, and he would owe no duty to the excess insurer who is left to pay on the collusive inflated verdict.

the lawyer's malpractice.  *See* Doc. 30, pp. 13-14, *citing National Union,* **2 F. Supp. 2d at 1024**.  In these circumstances, equitable subrogation is *not* akin to assignment to a stranger.

*National Union* and *TIG* are two examples of federal district court opinions based on Illinois Supreme Court law, both of which predict that the Illinois Supreme Court, under circumstances encompassing the facts of the instant case, would let an excess insurer bring a legal malpractice claim based on equitable subrogation against the firm and attorneys who represented the insured in the state court suit.  The Northern District of Illinois reached the same conclusion in *Grinnell Mutual Reinsurance Co. v. Franks, Gerkin & McKenna,* an unreported 2000 decision, **2000 WL 1222208, *4 (N.D. Ill. 2000)("If the court did not apply equitable subrogation, Grinnell would have to shoulder the economic loss caused by the behavior of the defendant, thus eliminating the disincentive to the defendants for engaging in malpractice.  Therefore, the court finds that Illinois law supports an insurer's claim of equitable subrogation against the attorneys of the insured.").**

The record before this Court and the independent research undertaken by this Court do not indicate that the Illinois Supreme Court would reach a contrary conclusion to *National Union, TIG* or *Grinnell Mutual.*   The undersigned Judge rejects Phoenix's arguments for dismissal of Counts III and IV, the equitable (or "legal") subrogation claims against Plaintiffs as excess and umbrella insurers of Safariland.

→       **Direct Legal Malpractice Claim**

In addition to the conventional and equitable subrogation claims against Phoenix, the amended complaint also contains a "direct" legal malpractice claim by Federal against Phoenix.  In moving to dismiss that claim (Count V), Phoenix contends that this cause of action does not exist under Missouri law.  The majority of briefing focuses on that contention (now rejected by the Court via the conflict-of-law analysis above), but Phoenix offers a back-up argument that even *if* Illinois

applies, Plaintiffs would not be allowed to assert a direct claim for malpractice against Phoenix.  The Court is not persuaded that dismissal of Count V is warranted.

First, the amended complaint pleads the elements of a legal malpractice claim in Illinois, including the existence of an attorney-client relationship between Federal and Phoenix establishing a duty on the part of Phoenix, negligent acts or omissions constituting a breach of that duty, proximate cause, and damages.  *See, e.g., TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.,* 444 F.3d 587, 590-91 (7th Cir. 2006), *citing Lopez v. Clifford Law Offices,* 841 N.E.2d 465, 470-71 (Ill. App. 2005).

Second, it is beyond doubt that Illinois law allows a direct malpractice claim by a *primary* insurer against the attorney retained by the primary insurer.  "In Illinois, it has long been recognized that an attorney retained by a primary insurer to represent its insured has a fiduciary duty to two clients:  (1) the insured and (2) the primary insurer.  [Citations omitted.]  Consequently, either the insured or the primary insurer can sue the retained attorney for legal malpractice."  *National Union,* 2 F. Supp. 2d at 1017.   *See also Maryland Cas. Co. v. Peppers,* 355 N.E.2d 24, 30-31 (Ill. 1976).

Phoenix does not dispute this principle but stresses that Plaintiffs cannot prove that they issued a *primary* policy because, in fact, Safariland had a self-insured retention policy for $1,000,000. Therefore, the true "primary" level of coverage, argues Phoenix, was the self-insured retention, and Federal's coverage only kicked in after that first level was exhausted.

 Phoenix's argument has first-blush appeal but is more suited to resolution by summary judgment motion than Rule 12(b)(6) motion.  Phoenix argues that Federal has not *established* that it is a primary insurer entitled to bring a direct malpractice claim.   But the question is not what has been established at this juncture; it is what has been pled, i.e., whether Count V presents a facially plausible claim.  And, on this 12(b)(6) motion, this Court makes that determination construing the

complaint in the light most favorable to Plaintiffs, accepting as true all well-pled facts, and drawing all possible inferences in Plaintiffs' favor. *Hecker,* **556 F.3d at 580.**

So construed, the amended complaint plausibly suggests that Federal is entitled to relief in Count V. The amended complaint alleges that Federal issued a *primary* policy, that (pursuant to obligations imposed on it by the primary policy) Federal assumed control of Safariland's defense in the Brough case once Safariland satisfied the self-insured retention, and that Federal permitted Phoenix to continue as Safariland's counsel, paying them for legal services rendered (Doc. 19, pp. 10-13). Cognizant that "[p]lausibility is not an exacting standard," *Jaros v. Illinois Dept. of Corrections,* **684 F.3d 667, 672 (7th Cir. 2012)**, and assuming the well-pled factual allegations to be true, the Court concludes that Count V survives Rule 12(b)(6) dismissal. Whether Safariland's $1,000,000 self-insured retention makes Safariland a primary insurer as opposed to an insured with a $1,000,000 deductible is a question best left for resolution another day.

### E.   Conclusion

For all these reasons, the Court **DENIES** Phoenix's motion (Doc. 22) to dismiss Plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

IT IS SO ORDERED.

DATED October 2, 2012.

s/ *Michael J. Reagan*
Michael J. Reagan
United States District Judge